No. 1538.—SAMUEL P. GREEVES, Administrator of F. R. BRUNOT v.
THE LOUISIANA STATE BANK.

A depositary who seeks to avoid the payment of deposits made and notes collec'ed, and the proceeds passed to the credit of the depositor, on the grounds that the deposits made, and the notes collected and the proceeds deposited were in an unlawful and worthless currency, commonly called Confederate notes, must establish the fact by evidence so conclusive that nothing is left to conjecture or inference. The doctrine in the case of Weaver v. Anjoux, 20 An. page 1, reaffirmed.

The evidence of witnesses who are unable to test'fy from personal knowledge to the character of the funds received on the notes collected by the bank and the deposits made, is not sufficient when not corroborated by the books of the bank, the checks drawn, etc., to establish with the legal certainty required, that the deposits made were in Confederate notes, and the depositary, under such proof, can not be relieved from responsibility to the depositor for the amount thus collected and deposited.

A bank that acted in the capacity of agent in the collection of notes, without instructions, can not be relieved from the payment of the amount collected in lawful money, by showing that Confederate notes were in general circulation at the time, and that the bank was in the habit of receiving and paying out such notes indifferently with other currency. To shield itself from responsibility under such circumstances, it must be shown affirmatively, that the depositor was fully aware of, and assented to, the receiving of Confederate notes in payment of his deposits, or that he acquiesced in, and fully ratified the receipt of such notes after they had been received by the bank in payment of notes placed there for collection.

APPEAL from the Fourth District Court, of New Orleans. *Théard*, J. Race, *Foster & E. T. Merrick*, for plaintiff and appellee. *W. H. Hunt* and *J. McConnell*, for defendant and appellant.

WYLY, J. The plaintiff sues to recover a sum of money deposited in

the Branch of the Louisiana State Bank by Mrs. Sophia Brunot in her capacity of administratrix of the succession of Felix R. Brunot, on the twentieth March, 1865, as appears by her bank book.

The answer denies generally the allegations of the petition, and avers that "no such sum in money, as is alleged in said plaintiff's petition, was or ever has been deposited in said Louisiana State Bank as alleged, but there was deposited in said bank to the alleged credit of said succession or estate named in said petition, a large number of the notes or purported promises to pay, commonly called Confederate notes, which said Confederate notes, were never, at any time, of any legal value whatever."

The issue thus made up, was that no sum of money, as claimed, was deposited, but that there was deposited a large number of purported promises to pay, called Confederate notes.

From the view we have taken of the case, it will be unnecessary to examine the bills of exception taken by the plaintiff.

The deposit of the twentieth of March, 1865, is fully established by the bank book and other evidence in the record.

To rebut this, the defendant introduced three witnesses who appear to have but little personal knowledge of the case, and their evidence fails to establish a valid defense. The main witness was W. S. Pike, who, after testifying of checks drawn by Mr. Brunot, says: "The balance to the credit of Brunot was transferred to the credit of Mrs. Brunot, administratrix; one check of six hundred dollars was drawn by Mrs. Brunot twentieth March, 1865. I am now referring to my books. The $18,472 66, which was to the credit of Mrs. Brunot, administratrix, was transferred on the twentieth March, 1865. This is the way the credit to Mrs. Brunot arose. Mrs. Brunot drew a check on the bank for the balance due and then transferred the amount of the check to her own credit as administratrix. No money passed at all."

On cross examination, however, he says. "On twentieth March, 1865, I was residing in New Orleans; my connection with the Branch Bank had not then ceased. These transactions on twentieth March, 1865, took place at Baton Rouge. *Of my own personal knowledge I know nothing of what occurred between Mrs. Brunot and the bank at that day."* * * * * * *

Again he swears: "*I know all this matter of my own knowledge because the transaction took place between the estate and my brother,* under my directions. I directed how the thing should be done." * * *

Again he says: "The three notes spoken of (the Allain notes) were deposited for collection on twenty-third April, 1861, and matured in January, February and March, 1862. *I know that these notes were collected in Confederate money, because they were payable at the mother bank in New Orleans, and no other money was used at that time at Baton Rouge, and, I believe, here also."*

To my mind it is evident that this witness had no personal knowl-edge of the deposit made by Mrs. Brunot, administratrix, or of the entry in the bank book on the twentieth of March, 1865; his own evidence discloses the fact that he was in New Orleans on that day, while the transaction in question occurred at Baton Rouge. Nor does he know any thing, of his own knowledge, whatever, about the collection of the Allain notes by the bank for Brunot in Confederate money. On this point his evidence is only a vague conjecture, based on his general knowledge that that currency was at that time mainly used at Baton Rouge and at this place.

His testimony fails, in our opinion, to establish the fact that Brunot was ever aware that the notes left by him for collection in the bank had been collected in Confederate money. True, he says: "There was a check of $1500 00, one of $150 00, one of $100 00, and one of $17 00 paid between the first January and first April, 1862, to Brunot in Confederate money. I don't know that Brunot had any notice that the funds would be Confederate money; but his checks were drawn against what he had to his credit and were paid in Confederate money." The witness does not swear that the money was paid to Brunot in person, because, he says, "I don't know that Brunot had any notice that the funds would be Confederate money." * * *

It is manifest that the witness Bernard, also had no personal knowl-edge of the matters of which he testified. Indeed, on cross examina-tion, he says: "I know nothing about Brunot's account. I know of no agreement with him. His account was kept in Baton Rouge. In taking up the notes spoken of no money was passed. Allain paid with his checks on our bank. I did not act as receiving teller, but I used to look over the cash every day to see if any thing else was received than Confederate money. Paul Blanc was receiving teller at the time." * * * * * * *

How could this witness in looking over the cash receipts of the day derive a personal knowledge of how Allain paid the notes to the receiving teller or in what particular currency they were paid?

The receiving teller may have collected the notes left by Brunot with the bank for collection, in good money, and the same not appear in the cash receipts. Why was he not introduced as a witness? He could have stated precisely the character of the funds received by the bank on the notes left with it by Brunot for collection.

On the vague and conjectural statements of the two witnesses here-tofore named and that of another, who admitted he was in Europe when these transactions occurred, the defendant asks to be relieved.

The bank has not furnished any positive evidence that the notes of Allain belonging to Felix R. Brunot, and left by him with the bank for collection, in April, 1861, were ever collected in Confederate money. No authority is shown to the defendant to make the collec-

tion in such money. No knowledge of the collection is brought home to Brunot.

Where then is any dealing in a treasonable currency or deposit of Confederate money by F. R. Brunot or his succession? Where is any ratification by Brunot of the collection, in Confederate money, made for him by the bank?

There is not a particle of proof that he ever authorized the bank to make the collection in Confederate money or that he was ever informed thereof. Indeed, the witness Pike says, "I do not know that Brunot had any notice that the funds would be Confederate money."          *          *          *          *          *          *

When the notes were deposited by Brunot with the bank for collection Confederate notes had not yet been issued. How can a principal be said to have ratified the illegal acts of his agent when he was never informed thereof? There is no evidence that Mrs. Brunot was informed that the collection was in Confederate notes when she drew out the money standing to the credit of Brunot, in March, 1865, and made the deposit in her own name as administratrix.

Indeed it is quite evident that such was not the case; otherwise why did they permit her to check out funds which they now say "was treasonable and never had any value," and make with them a deposit for herself on twentieth March, 1865? Why did they make up for her the bank book showing a deposit of $18,472 66, and also permit her on the same day to draw out therefrom $600 00 in United States currency, and credit her bank account therewith?

We can not believe that the intelligent officers of a bank would, after Confederate money had ceased to have any value, as on twentieth March, 1865, permit Mrs. Brunot to check against the treasonable deposit of her husband, and upon that check open an account with his succession acknowledging the deposit of a large sum in dollars, and at the same time ratify that deposit as of good and valid funds by permitting her to check out six hundred dollars, of good money, and credit the account therewith?

We can not believe that they could be so far overreached by an inexperienced woman as to make the check against worthless paper the basis for opening an account and giving her credit on their books for the large amount of $18,472 66.

The proposition is unreasonable and inconsistent with the ordinary prudence of men, much more so with that of the fiscal agents of a bank.

The whole defense appears to be an afterthought, an ingenious dodge based upon the vague conjectures of witnesses, who were not present and who had no personal knowledge of the transactions between Mrs. Brunot and the Branch Bank on the twentieth March, 1865, for the purpose of evading the consequences of a legitimate transaction.

The obligations of a mandatary and depositary can not thus be shuffled off by the defendant.

It is therefore ordered that the judgment of the court *a qua* be affirmed, with costs.

---

I concur in the decree rendered in this case.

W. W. HOWE.

---

LUDELING, C. J., *concurring:* The bank book of Brunot shows that the Allain notes were deposited with the bank in April, 1861.

The notice published by the bank on the sixteenth of September, 1861, announced that the bank had suspended specie payments on its liabilities—that thereafter Confederate money would be accepted in payment and received on deposit—parties having paper on collection in the bank were notified to *withdraw* the same *unless they consented to receive Confederate notes or local bank notes* in payment of said paper to withdraw the same; and no paper would, thereafter, be received on collection when the owners required other than *treasury or local bank notes* in payment thereof.

There is no proof that Brunot ever saw, or heard of, this notice, or that he subscribed for or read the newspapers in which the notice was published. Its publication was not notice to Brunot.

But even if the evidence had established that this notice was known to Brunot, it simply requested him to withdraw the notes, unless he consented to have them collected in Confederate notes, or bank notes. His failure to withdraw the notes from the bank did not authorize the bank to collect them in unlawful money. If the bank did not wish to keep the notes for collection, unless it was permitted to take Confederate notes or bank notes for them, it could have returned them to Brunot, but it could not take anything but lawful money for them without the consent of Brunot. This seems to have been the opinion of the bank when it published the notice aforesaid, for it said to its customers, "unless you will consent to have your notes collected in Confederate notes or bank notes, take them away." The consent of Brunot was never given. It is said that Confederate money was paid to Brunot, and that he must be held to have approved the acts of the bank in receiving Confederate money for the Allain notes. A careful examination of the evidence has satisfied me that there is no proof that Confederate money was ever paid by the bank to Mr. Brunot himself, but that Confederate money was paid to the bearers of the checks drawn by Brunot on the bank, for $1500, $150, $100, and $17. In speaking of these checks the witness says, "I do not know that Brunot had any notice that the funds would be Confederate money; but his

checks were drawn against what he had to his credit, and were paid in Confederate money."

The evidence does not satisfy me that the Allain notes were collected in Confederate money. Allain, the debtor, had an account with the bank, and he gave his checks on the bank for the notes, deposited by Brunot with the bank, as they matured. The witness says: "These. checks did not express Confederate money on their face, but it was understood and agreed that all our customers should take Confederate money."

By whom was this understanding and agreement made? The evidence does not establish any such agreement between the bank and Brunot, or between the bank and Allain, or between Brunot and Allain.

We have decided repeatedly that an agent will not be released from responsibility, if he received Confederate money for his principal without authority to do so. Succession of Jesse W. Wilder, 21 An. 371.

We have also decided that one, who seeks to screen himself from liability on the ground that the transaction was based on Confederate money, must prove the fact, and not leave the matter to inferences or presumptions. Weaver v. Anfoux, 20 An. p. 1.

In this case, however, the inferences and presumptions are altogether in favor of the plaintiff.

The bank book in evidence shows that on the tenth of July, 1861, there was to the credit of Brunot, in the bank, $18,473 66. On the twentieth of March, 1865, this amount was passed to the credit of Mrs. Sophia Brunot, administratrix, on her check; and on the same day, as administratrix, she checked against this fund for six hundred dollars, which was paid in United States treasury notes. There were not two amounts to her credit as administratrix, one for Confederate money, and one for lawful money, as contended, but only one amount, $18,473 66, against which she drew.

I think the evidence establishes the right of the plaintiff to recover. I therefore concur in the judgment rendered by Mr. Associate Justice Wyly.

_____

For the reasons given by the Chief Justice, I concur in the decree in this case.                                          R. K. HOWELL.

_____

TALIAFERRO, J., *dissenting.* It is insisted upon that it is not proved that Brunot authorized or approved the collection of the Allain notes in Confederate money, nor that knowledge is brought home to him of the notice of the bank to their depositors to withdraw their notes, if they were not willing to have them collected in Confederate money. It is.

proved that he put the Allain notes, amounting together to $16,939 98, in bank for collection, and that these notes constituted much the larger portion of all he had in bank.    It is proved that the bank gave public notice to its customers to withdraw their notes on hand for collection, if they refused to receive Confederate money for them.    The transactions were with the Branch Bank at Baton Rouge.

Brunot lived at Baton Rouge, or in its vicinity.    He had been dealing with the bank for many years; he must have known the officers of the bank.    He had a deep interest in the currency; nearly all he had, when realized, was to be in Confederate money; he knew, as well as everybody else, that he could get no other money for his Allain notes but Confederate money, and not the slightest gleam of anything is shown, or pretended to be shown, that he objected.    It is an historical fact that this court will judicially notice, that during the time these Allain notes were in process of collection, that is during the first four months of the year 1862, the current opinion in this country was that the Confederacy would certainly prove a success, and there was, all through that period at least, the utmost confidence in Confederate paper money.    Instances in this country, at that time, of an opposite opinion were very rare.

The record of this case teems with testimony which has been often reiterated in other similar cases before this court, and which shows that after the seventeenth of September, 1862, and up to the following April, when New Orleans was taken possession of by the Federal forces, the only currency, the only thing called circulating medium or money in Louisiana, was Confederate money.

The aggregate testimony in all the preceding cases involving the inquiry, and the mass of testimony in this case on the same subject, is overwhelming, that during the period we have in view, with very few and very rare exceptions, every money transaction in Louisiana was consummated by the use of Confederate money.

Now, when I am told that Brunot was ignorant of this state of facts, and expected his Allain notes to be collected in gold or silver, or legal currency, I stand amazed that a gentleman of intelligence, of large business—a man dealing in money, keeping accounts with banks for many years before the war and during the war, and especially with the bank that is defendant in this case, to the end of his life, having lived all his days in Louisiana, should be so far behind everybody else in a knowledge of the fact of the exclusiveness of the Confederate currency as to expect or require the three notes in question to be collected in any other than Confederate currency.    The pretense that he expected gold or silver, or the equivalent in good and lawful money for the notes, is so monstrous that I give no credit to it whatever.    From the multitudinous facts we have on this subject, by the testimony of witnesses, and by the teachings of history, I hold the deduction to be

logical that Brunot knew, in regard to these subjects, what everybody else knew, and that he knew the bank had collected his Allain notes in Confederate money, and that he was contented therewith. Most certainly the presumption is violent that such was the fact, and the presumption is not in the minutest degree rebutted. But I shall show, further on, that this matter does not rest solely on presumption or inference.

It is pretended that Mrs. Brunot made a deposit of money in the bank on her own account in the month of March, 1865, and drew upon her own check on this deposit $600 in greenbacks, or United States currency. The effort to make something out of this transaction is a very decided failure. Pike, the cashier, speaking from the bank book, shows that, on the tenth of July, 1861, Brunot's account was balanced, and that there was on that day to his credit $3302 66, and that the next credit was on the sixth of January, 1862. That credit arose from the proceeds of the first of the Allain notes that became due, and amounted to $5646 66. On the —— day of February following, the second note, for the like sum, was collected, and the third, for the like sum, was collected in March following.

On the twenty-fifth of June, 1862, the account was again balanced, and there was to Brunot's credit $18,472 66. Now, it is perfectly clear that this $18,472 66 is made up of the $3302 66 due Brunot before the suspension of specie payments, augmented by the amount of the Allain notes—$16,939 98—and diminished by the amount of four checks, amounting in all to $1767, paid to Brunot between the first of January, 1862, and the first of April following. These four checks were paid in Confederate money, as we shall have presently to notice. Taking, then, $1767 from the aggregate amount of the Allain notes—$16,939 98, and we find the $18,472 66 is composed of $15,172 88 Confederate money and $3302 66 of legal currency. Against the aggregate— $18,472 66—Mrs. Brunot, as administratrix, drew the $600 check which was paid in United States currency, because the bank owed the estate of Brunot $3302 66 in legal currency.

As to any actual deposit of any sum of money in the bank on the twentieth of March, 1865, or at any other time, either on her own account or as administratrix, there is not a particle of evidence to sustain it. It was arranged that Mrs. Brunot, as administratrix, (and at the instance of the cashier she was appointed administratrix for the purpose), should check for the balance due the estate, and that it should then be placed to her credit as administratrix. This check, which was drawn on the twentieth of March, 1865, is placed to the credit of the bank; and on the same day the same amount is placed to her credit as administratrix.

The testimony of the cashier is: "This is the way the credit to Mrs. Brunot arose. Mrs. Brunot drew a check on the bank for the balance

due, and then transferred the amount of ·the check to her own credit as administratrix. No money was passed at all." ＊ ＊ ＊ "I can swear, to my own personal knowledge, that no money was paid to Mrs⸳ Brunot on her check on the twentieth of March, but the credit arises simply from a transfer of the credit to F. R. Brunot, of whom she was administratrix. I know all ˏthis of my own knowledge, because the transaction took place between the estate and my brother, under my directions. I directed how the thing should be done. The letters of administration were sent to me for my approval, and I sent instructions to accept the check and transfer the account of F. R. Brunot to Mrs. Brunot, as administratrix."

Let it be noted that there were two checks drawn on the twentieth of March, 1865—one of them for the amount in bank to the credit of the estate, and the other for the $600 which was paid in United States currency. The attempt is entirely in vain to show that Mrs. Brunot made a deposit on that day, or at any other time, individually, or as administratrix.

The bank book contains this entry on the debit side of the account with the estate: ·' March 20, 1865, $18,472 66." Now, if Mrs. Brunot deposited that sum at that date, it is confronted by the check of the same date, for the same sum, put to the credit of the bank on the opposite side of the page. It would in that case show that she had drawn the whole amount, and consequently would have nothing now to demand from the bank. There is nothing showing that Mrs. Brunot had a cent of her own money in bank against which this check was drawn. The deposit appears as made by her as administratrix. If she actually deposited $18,472 66, as administratrix, on the twentieth of March, 1865, she must have brought it from some other place, for that sum .was, on the twentieth of March, 1865, to the credit of the estate, from collections made by the bank. The bank book shows that against the balance struck on the twentieth of March, 1865, as due to the estate of Brunot, the check was drawn. It is entered as a credit to the bank on the opposite side, and as drawn by Mrs. Brunot, as administratrix. Then follows the entry below of $18,472 66 placed to her credit as administratrix, and against it the check for $600 is credited to the bank. All this appears from the bank book in evidence. The testimony of Pike is only explanatory of the operation—a mere statement of how the arrangement was made so as to place the sum due to the estate under the control of the administratrix. His testimony does not in any manner contradict the bank books. It was introduced to explain and make the matter clear, and it was legally and properly admitted. In my judgment it was unnecessary for that purpose; the record being sufficiently clear without it.

But still, it is alleged that it is not *proved* that the Allain notes were collected in Confederate money with Brunot's consent, nor that he ever

received the bank notice to depositors to withdraw their notes, if unwilling to receive Confederate money for collections. I ask, then, what is proof? Mathematics is the only science that can fairly pretend to perfect certainty of evidence. Legal science makes no such pretensions. Outside of pure mathematics, no process by reason in any other department of human investigation can possibly equal the absolute certainty of its conclusions. The geometrician uses reason with greater effect than the lawyer. The former demonstrates; the latter, with the utmost tension of his powers, can only establish a strong probability of the truth of the proposition stated, by an array of connected evidence that leaves no reasonable doubt upon the mind of its reality. This is proof in a court of justice. This record abounds with evidence, all pointing in one direction, and which, in my judgment, raises a very strong probability that Brunot not only knew of the bank notice, but approved the collection of the notes in question in Confederate currency. A very careful examination of, and deliberation upon the entire evidence leaves no reasonable doubt in my mind on the subject. I consider the defendant's case fully made out, so far as the amount of the Allain notes is concerned.

But there is something more. I now return to the four checks of Brunot. One of these was for $1500, one for $150, one for $100, and the other for $17, making in the whole $1767. These four checks, the cashier swears, were paid between the first of January, 1862, and the first of April following, and that they were paid to Brunot himself, and paid in Confederate money. A vain attempt is made to ward off the effect of this conclusive evidence by pretending to show a contradiction in the witnesses' testimony. What immediately followed this statement is referred to for this purpose. All that the witness said on this subject is here reproduced from the record: "There is one check of $1500, one of $150, one of $100, and one of $17, paid between the first of January and first of April, 1862, to Brunot in Confederate money." * * * "I don't know that Brunot had any notice that the funds would be Confederate money; but his checks were drawn against what he had to his credit, and were paid in Confederate money."

What possible contradiction can be found here? What earthly difference can it make whether Brunot had notice that these checks would be paid in Confederate money or not? They were paid to him in person, and in Confederate money. He received it. He knew what it was, and was satisfied with it. What, then, becomes of all the arguments set up to screen from view the kind of money in which these operations were carried on? The plaintiffs are effectually estopped by this clear, direct and uncontradicted proof that Brunot received Confederate money from the bank without objection on these four checks, amounting to $1767.

The judgment should be reversed, and one rendered for $3302 66, less the amount of the $600 check.

Rehearing refused.